UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KRISTINE M. HOOVER,          :
                             :CIVIL ACTION NO. 3:15-CV-661
          Plaintiff,         :
                             :(JUDGE CONABOY)
          v.                 :
                             :
CAROLYN W. COLVIN,           :
Acting Commissioner of       :
Social Security,             :
                             :
          Defendant.         :

---

**MEMORANDUM**


     Here the Court considers Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act.  (Doc. 1.)  In the
February 22, 2012, Disability Report, Plaintiff alleged disability
due to multiple sclerosis ("MS"), degenerative disc disease,
multiple lumbar surgeries, back pain due to MS, depression due to
MS, bowel and bladder issues due to MS, tachycardia and arrythmias,
memory problems and cognitive issues from MS, blurred and double
vision at times, muscle stiffness, spacticity, numbness, weakness,
and muscle tears and muscle issues.  (R. 211.)   Plaintiff
originally identified her onset date as September 19, 2011, and
later amended it to December 19, 2011.  (Doc. 12 at 1.)  The
Administrative Law Judge ("ALJ") who evaluated the claim, Sharon
Zanotto, concluded that Plaintiff's severe impairments of multiple
sclerosis, degenerative disc disease, status post lumbar
laminectomy and fusion, obesity, osteoarthritis of the right hip,

and affective disorder did not alone or in combination with other impairments meet or equal the listings. (R. 28-32.) The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy. (R. 32-37.) The ALJ therefore found Plaintiff was not disabled under the Act from December 19, 2011, through the date of the decision, September 27, 2013. (R. 31.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ incorrectly concluded that Plaintiff does not meet or medically equal Listings for multiple sclerosis and affective disorders; 2) the ALJ incorrectly concluded that Plaintiff can perform sedentary work; 3) the ALJ did not properly analyze Plaintiff's need for restroom breaks; and 4) the ALJ did not properly analyze the effect of medication on Plaintiff. (Doc. 9 at 7.)

After careful consideration of the administrative record and the parties' filings, I conclude Plaintiff's appeal is properly granted and this matter remanded for further consideration.

## I. Background

### A.   *Procedural Background*

On January 26, 2012, Plaintiff filed an application for DIB. (R. 26.) As noted above, Plaintiff initially alleged disability

beginning on September 19, 2011, due to a number of physical and mental conditions.  (R. 211.)  The claim was initially denied on April 16, 2012.  (R. 26.)  Plaintiff filed a request for a review before an ALJ on May 4, 2012.  (*Id.*)  On August 13, 2013, Plaintiff, represented by Attorney Shawn McLaughlin, appeared and testified at a hearing.  (R. 45-97.)  Vocational Expert ("VE") Cheryl Busten also testified.  (*Id.*)  At the hearing, Plaintiff amended her onset date to December 19, 2011.  (*Id.*)  ALJ Sharon Zanotto issued her decision on September 27, 2013, finding that Plaintiff was not disabled under the Social Security Act through the date of the decision.  (R. 38.)  On October 17, 2013, Plaintiff requested a review with the Appeal's Council.  (R. 17-19.)  The Appeals Council issued its decision on March 13, 2015, denying Plaintiff's request.  (R. 1-5.)

On April 2, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on June 11, 2015.  (Docs. 5, 6.)  Plaintiff filed her supporting brief on July 24, 2015.  (Doc. 9.)  Defendant filed her opposition brief on August 26, 2015.  (Doc. 10.)  With the filing of Plaintiff's reply brief (Doc. 11) on September 9, 2015, this matter became ripe for disposition.

## B.    *Factual Background*

Plaintiff was born on September 24, 1965.  (R. 30.)  She was

3

forty-six years old on the alleged disability onset date of December 19, 2011. Plaintiff has a high school education and her LPN certification. (R. 60.) Plaintiff testified that she reduced her working hours in the fall of 2011 and stopped working after her third back surgery on December 19, 2011. (R. 54, 57.) Plaintiff has past relevant work as a licensed practical nurse. (R. 37.)

**1. Impairment Evidence**

*a. Physical Impairment Evidence*

i. Multiple Sclerosis

Plaintiff was diagnosed with multiple sclerosis in late 2007 and was treated by neurologist Anthony P. Turel, M.D. of the Milton S. Hershey Medical Center. (*See*, *e.g.*, R. 446.) She continued to be treated by Dr. Turel through early 2012 when her care was transferred to Gary Thomas, M.D. (Doc. 9 at 6 (citing R. 994).)

Dr. Turel's records show that Plaintiff was working a reduced schedule in July 2011 because she had back surgery in April 2011. (R. 666.) At the July 29, 2011, visit, Dr. Turel noted that Plaintiff did not have any changes in her overall neurologic status. (*Id.*) However, Plaintiff continued to have a significant amount of discomfort in her low back, was unable to sit for any extended period, and had to change positions frequently. (*Id.*) Plaintiff was taking Tramadol regularly for pain and Tylenol #3 intermittently for breakthrough pain. (*Id.*) Plaintiff reported that the Tylenol put her to sleep so she tried to avoid it. (*Id.*)

4

She had been told by her back surgeon that he may need to do another procedure if the discomfort did not improve. (*Id.*) Neurological examination showed that Plaintiff was alert and oriented, with normal speech and language, and normal recall. (*Id.*) Dr. Turel noted that she was tearful at times because of her job and back problems. (*Id.*) Cranial nerve testing showed the visual fields to be intact to confrontation, she had bilateral optic atrophy, facies showed symmetrical grimacing, and her gag, palate and tongue were normal. (R. 667.) Motor examination showed that power in the upper extremities was 5/5 and she had discomfort in the lower extremities, but her strength appeared to be at least 4/5 throughout. (*Id.*) Plaintiff's reflexes in the upper extremities were 1+ on the left at the biceps and triceps, right side reflexes were 1.5+. knee jerks were 2+ left and 1+ right, ankle jerk was absent right and was 1+ left, and plantar responses were flexor. (*Id.*) Dr. Turel recorded the following Impression: History of multiple sclerosis, relapsing-remitting type; degenerative spine disease, status post lumbar fusion and fixation; anxiety and reactive disorders; and mild obesity. (*Id.*) The plan was for Plaintiff to follow up with her surgeon for her back problems and return to Dr. Turel in three to four months unless she had problems before then. (R. 668.) Dr. Turel again noted that Plaintiff was working on a limited basis, adding that "[s]he does have discomfort and will require job modification." (*Id.*)

Plaintiff was again seen by Dr. Turel on September 16, 2011, "as an urgent return because of complaints of having increased fatigue, eyes are 'jumping', blurred vision, and a feeling of dizziness." (R. 669.) Plaintiff also noted increased urinary frequency over the preceding few weeks and problems with continuous back pain. (*Id.*) Dr. Turel noted that Plaintiff had previous back surgery and may require another procedure. (*Id.*) In his "Review of Systems," Dr. Turel recorded that Plaintiff had urinary urgency and occasionally has urge incontinence or leakage, she complained of "'numb headaches,'" a feeling of generalized weakness, and some difficulty with memory. (R. 670.) Dr. Turel found that Plaintiff had a somewhat flattened affect and a normal neurological examination. Cranial nerve testing showed bilateral optic atrophy and an occasional downward, very brief nystagmoid jerk which was not sustained. (*Id.*) Motor examination showed normal tone in the upper extremities and 5/5 power; lower extremities had 4.5 power at the iliopsoas, quadriceps, hamstrings and dorsiflexors of the feet. (*Id.*) Deep tendon reflexes in the upper extremities were 1+ at the biceps and triceps, with the right side a "shade brisker." (*Id.*) Knee jerks were absent on the right and 2+ on the left, ankle jerks were 1+ bilaterally, and plantar responses were flexor. (*Id.*) Dr. Turel's impression included "[q]uestionable acute flare of MS." (*Id.*) Dr. Turel decided to give Plaintiff a short course of tapered prednisone and she was to continue on methotrexate and come

back for follow up in November.  (R. 671.)

At her November 25, 2011, visit, Dr. Turel noted that Plaintiff was scheduled for another surgical procedure on her back on December 19, 2011.  (R. 1012.)  He recorded in the Outpatient Note that Plaintiff had not had any recent flares of her multiple sclerosis, adding "[s]he is, however, unable to work, and the fatigue of her MS along with the back problem causes her to be unable to work."  (*Id.*)  In his Review of Systems, Dr. Turel stated the following:

> This is positive for her noting night sweats. She also has complaints of blurring of vision and intermittent double vision.  She complains of chest palpitations.  She had an irregular heartbeat in the past.  She also complains of shortness of breath.  She has problems with bowel function and constipation.  She also notes her menses to be irregular.  She has pain in her knees. She had arthroscopic surgical procedures done on her left knee, which is still tender.  She also has chronic problems with back pain. She has diffuse fatigue, and she also complains of numbness.  She has problems with walking and says that she is unsteady.  She has occasional tremulousness.

(R. 1012.)  Neurological examination showed that Plaintiff walked with a slightly wide-based gait and she had a slight limp.  (R. 1013.)  Funduscopic examination revealed bilateral optic atrophy. (*Id.*)  Motor examination showed normal motor tone, no spasticity and 5/5 strength in the upper extremities.  (*Id.*)  In the lower extremities, Plaintiff had slight weakness.  (*Id.*)  Deep tendon reflexes were equal in the upper extremities and 1+ at the biceps,

triceps, and brachiordialis. (*Id.*) In the lower extremities, her right knee jerk was 1+ and the left was 2+, ankle jerks were 1+ bilaterally, and plantar responses were normal. (*Id.*) Dr. Turel noted that Plaintiff was going to go on short-term disability "as a result of her back surgery and the superimposed multiple sclerosis." He planned to schedule Plaintiff for a follow up appointment in four months and noted that he would be leaving the Medical Center at the end of June 2012. (R. 1014.)

On March 23, 2012, Dr. Turel saw Plaintiff for follow up and she reported that she had stopped working as a nurse. (R. 1007.) Dr. Turel recorded that Plaintiff had another back surgery since her last visit and "has a myriad of complaints regarding her nervous system today." (R. 1007.) Dr. Turel also noted the following:

> The patient has not had any clear attacks or change in her status. She, however, complains of a number of symptoms including blurring vision and intermittent episodes in which she feels she has diplopia. These are not persistent phenomena. She also complains of diffuse weakness and fatigue. She says that she is having difficulty with concentrating and not being able to perform her job. The cognitive problem was one of the reasons she left work.
>
> She has applied for disability. She has periods when she has tremulousness of her hands and notes that she feels her balance is off. She has complaints of intermittent headaches. She complains of being depressed.

(R. 1007.) Results of her physical examination were similar to the

preceding visit. (R. 1008, 1013.) Under "Plan and Comment," Dr. Turel stated that Plaintiff had "a number of diffuse comments of increasing fatigue, difficulty concentrating, and diplopia." (R. 1009.) He added that it had been more that a year and a half since Plaintiff's last MRI study and he was planning to do a repeat study and other testing and advise her of the results. (*Id.*) He further noted that Plaintiff would be followed by Dr. Thomas or Dr. Tenser in four to six months. (R. 1009.)

In correspondence dated April 11, 2012, Dr. Turel informed Plaintiff that he had compared her most recent MRI study with studies going back to 2008 and her "lesion load continues to remain unchanged"––there was no evidence of new lesions or leakage of contrast dye which indicated no active lesions. (R. 1003.) There were no lesions in the brainstem or cerebellum. (*Id.*) He also informed Plaintiff that she was scheduled for an appointment with Dr. Thomas in July.[1] (*Id.*)

ii. Degenerative Disc Disease

Plaintiff treated with neurosurgeon Keith Kuhlengal, M.D., for her degenerative disc disease and right hip pain. (Doc. 9 at 6.) He performed multiple back surgeries, the last of which was on December 19, 2011. (*See* R. 987.) At Plaintiff's March 17, 2012,

---

[1] I find no record of outpatient notes from Dr. Thomas or any other doctor who treated her multiple sclerosis after April 2012. The opinions expressed by Dr. Thomas in 2013 will be addressed in the text.

visit, Dr. Kuhlengel noted that she was progressing "adequately well at 3 months." (*Id.*)  He discussed a water exercise program and wanted to see her in twelve weeks. (*Id.*)

Dr. Kuhlengel saw Plaintiff on June 9, 2012, at which time Plaintiff expressed frustration that she still had pain which radiated from the back across the gluteal regions. (R. 1040.)  He encouraged Plaintiff to increase her activities, especially the water program. (*Id.*)  Dr. Kuhlengel planned to see Plaintiff in three months.

At her September 8, 2012, visit, Plaintiff reported that she was still having symptoms of back pain with radiation to the right hip and thigh and that she had episodes of tingling in both legs when lying flat in bed while trying to sleep. (R. 1195.)  Plaintiff also reported that her multiple sclerosis was becoming more symptomatic. (*Id.*)  Dr. Kuhlengel planned to do further studies and discuss the results with Plaintiff. (*Id.*)

Plaintiff again saw Dr. Kuhlengel on December 8, 2012, with complaints of worsening right hip pain. (R. 1194.)  Plaintiff had received an injection in the hip after being evaluated by Dr. Hughes of Orthopedic Associates of Lancaster who thought the pain was coming from her back. (*Id.*)  Dr. Kuhlengel noted that Plaintiff also had an EMG/nerve conduction study by Dr. Gary Thomas on October 29, 2012, which showed mild chronic left sided L2-3 and L5 radiculopathies without active denervation. (*Id.*)  Dr.

Kuhlengel did x-rays which showed degenerative changes at L2-3 and L5-S1 and he wanted Plaintiff to have a bone scan before he made further recommendations. (*Id.*) He noted that Plaintiff was very frustrated that even walking in water was aggravating the right hip pain for which she was using a cane. (*Id.*)

On January 5, 2013, Plaintiff returned to Dr. Kuhlengel for follow up of the back pain that was radiating to both lower extremities. (R. 1193.) Plaintiff was using Tylenol alternating with Tylenol codeine #3 for pain control as well as an intermittent Ativan for muscle spasm. (*Id.*) Dr. Kuhlengel noted that if Plaintiff takes Flexeril, she sleeps most of the next day due to its sedative side effects. (*Id.*) He reviewed Plaintiff's medical and medication status and recommended medication management. (*Id.*) He also reviewed Plaintiff's capabilities "which include lifting occasionally up to 15 pounds, and acknowledging that she has very poor tolerance of sitting, standing, walking, and riding in a car." (*Id.*) Dr. Kuhlengel planned to obtain follow up lumbar x-rays in three to four months.

b. *Mental Impairments*

For her mental health problems Plaintiff treated with psychologist Michael Mayers, Ph.D., of Life Management Services beginning in April 2012. (R. 1171.) In May 2012, Dr. Mayers' mental status examination showed the following: good attention; appropriate affect; depressed mood; well-groomed appearance; calm

11

motor activity; no hallucinations or delusions; intact memory, judgment and insight; oriented in all spheres; no suicidal or homicidal ideations; good impulse control; and normal speech.  (R. 1169.)  His "Diagnostic Formulation" identified code number 309.28 under Axis I.  (R. 1170.)  Diagnostic Code 309.28 refers to "adjustment disorder with mixed anxiety and depressed mood."[2]  Dr. Mayers assessed a GAF of 63.  Plaintiff showed mild to moderate improvement at her next visit, and little or no progress at the following visit.  (R. 1159, 1161.)  Plaintiff again showed mild to moderate improvement at her June 2, 2012, visit and mild improvement at her July 11, 2012, and August 2, 2012, visits.  (R. 1153, 1155, 1157.)  Dr. Mayers closed Plaintiff's file in October 2012, noting in correspondence to Plaintiff that he would be available if his services were needed in the future.  (R. 1148, 1152.)

Plaintiff also treated with psychiatrist Hector Diaz, M.D., and individual therapist Marilyn Banks, L.C.S.W., of Community Services Group.  She was evaluated by Dr. Diaz in May 2012.  (R. 1032-34.)  He noted that she was seeing an individual counselor every two weeks (presumably Dr. Mayers).  (R. 1033.)  Based on his mental status examination, Dr. Diaz reported that Plaintiff was cooperative, spoke in a normal rate, tone and volume, became

---

[2] See http://www.icd9data.com/2012/Volume1/290-319/300-316/309/309.28.htm.

tearful when recounting her symptoms, her affect was a bit restricted, reported her mood was "still not good," she showed no psychomotor agitation but perhaps some psychomotor retardation, she was motivated and had the capacity to think introspectively, and stayed preoccupied about her health and how it was impacting her family. (R. 1034.) Dr. Diaz diagnosed Plaintiff with Major Depression, R/O Mood Disorder NOS and assessed a GAF of 50. (*Id.*) He noted that Plaintiff had intermittent depressive symptoms for years which she attributed to her other health conditions. (*Id.*) Dr. Diaz recommended that Plaintiff begin a trial of very low dose Zoloft and continue with individual counseling. (*Id.*)

At her medication management visit with Dr. Diaz on July 24, 2012, Plaintiff reported that she felt "calmer" and slightly less depressed. (R. 1225.) She also reported that her MS was stable. (*Id.*) Dr. Diaz recorded that Plaintiff's mood was good. (R. 1225-26.)

On September 25, 2012, Dr. Diaz noted that Plaintiff's moods were "consistently better" and her husband had noticed this. (R. 1230.) He also noted that Plaintiff's sleep varied and she could do most activities, but she still had chronic pain in her knees and back and had stopped counseling because she did not feel the therapist was helpful. (*Id.*) Plaintiff's mood was good. (R. 1230-31.) Dr. Diaz planned to continue the slow increase in the Zoloft dosage and refer Plaintiff to therapy. (R. 1233.)

13

Plaintiff began seeing Marilyn Banks, L.C.S.W., for individual therapy in October 2012. (R. 1216.) Plaintiff presented with several concerns: financial, health, mother, and children. (*Id.*) On November 19, 2012, Plaintiff presented with a flat mood, and Ms. Banks recorded that Plaintiff was very concerned about her own health and that of her mother. (R. 1217.) Ms. Banks noted that Plaintiff said she was in chronic pain which was visible as she walked. (*Id.*) On November 26, 2012, Plaintiff reported that she was feeling a little better. (R. 1218.)

At her medication management visit with Dr. Diaz on November 26, 2012, Plaintiff reported that most days "she can feel relatively euthymic," but her back, hip and MS were flaring up so she was not sleeping as well and had more physical discomforts. (R. 1235.) She had plans to follow up with her specialists. (*Id.*) Dr. Diaz noted that Plaintiff was walking slowly and using a cane. (*Id.*) He recorded that her mood was good, her affect reactive and blunt but she could smile appropriately, and her insight and judgment were fair. (R. 1235-36.)

Ms. Banks noted on December 13, 2012, and January 15, 2013, that Plaintiff continued to have chronic pain along with additional medical tests and concerns, and her mood was more depressed as a result. (R. 1219.) On January 30, 2013, Plaintiff reported to Ms. Banks that she fell, supported by a cane. (R. 1221.)

On January 30, 2013, Plaintiff reported to Dr. Diaz that her

14

moods were steadier and she could usually sleep more consistently. (R. 1240.) Dr. Diaz noted that Plaintiff continued to deal with chronic pain and was undergoing additional testing for MS treatment. (*Id.*)

At her visits with Ms. Banks in February and March 2012, Plaintiff's mood was congruent with issues of pain and other stressors. (R. 1222, 1252, 1253.) She was having difficulty keeping active (including difficulty walking the dog) due to pain. (R. 1253.)

On April 4, 2013, Ms. Banks noted that Plaintiff continued to have health problems and had recently been in the emergency room due to side effects of her new MS medication. (R. 1254.) Plaintiff reported that she wanted to be more active but when she tried she ended up in bed for two days because of the resulting pain. (*Id.*) Plaintiff's mood was reported to be "ok" but exacerbated by pain. (*Id.*)

On April 24, 2013, Dr. Diaz recorded that Plaintiff was doing "OK despite ongoing struggles with MS, back and knee pain." (R. 1246.) She was switching to a different MS drug and continued with other medications, noting side effects with some. (*Id.*) Plaintiff's mental status exam was basically normal although her affect was blunt and she was subdued but could smile appropriately. (R. 1246.) He noted that Plaintiff was using a cane. (*Id.*) Dr. Diaz assessed her GAF at 55 "on admission" and also noted that the

GAF was effective as of 10/31/12.  (R. 1247.)

In May and June 2013, Plaintiff continued to report chronic pain and her mood was congruent to the severity of the pain.  (R. 1256-57.)  She had fallen in mid-May which she said exacerbated her other problems.  (R. 1257.)  Plaintiff reported that she was on new MS medication and she was sleeping more.  (*Id.*)  On June 18, 2013, Plaintiff presented to Ms. Banks with a cane, in chronic pain and tired.  (R. 1258.)  Plaintiff said she was having trouble sleeping with her new medication.  (*Id.*)

On July 9, 2013, Plaintiff reported ongoing problems with her MS symptoms, noting that heat made her pain worse, she had to cut down on her walking, and she had more sleep problems.  (R. 1259.)  Plaintiff also reported that her eyesight had worsened (she was using a magnifying glass or husband's help), and she was sometimes unable to find the word for what she wanted to say.  (*Id.*)  Plaintiff noted that she was more limited as to what she could do by herself without stopping to rest.  (*Id.*)  Ms. Banks recorded Plaintiff's mood to be "ok."  (*Id.*)

Plaintiff saw Dr. Diaz on July 10, 2013, for medication management.  (R. 1249.)  Although Plaintiff reported that her moods were relatively stable, she wanted to change medications because of sexual side effects and an inability to cry/numb feeling.  (*Id.*)  Plaintiff's mental status exam was the same as recorded in April.  (R. 1246-47, 1249-50.)  She was using a cane.  (R. 1249.)  Dr. Diaz

16

changed Plaintiff's medication and recommended continued therapy. (R. 1251.)

## 2. **Opinion Evidence**

In a form dated April 4, 2012, the author noted Plaintiff's gait to be slow and cautious with a slight limp.[3] (R. 996.) It was also noted that Plaintiff recently began to use a cane which was clinically required for weight-bearing/ambulation. (*Id.*) The cane was used because Plaintiff felt unsecure walking and the device was used at her discretion. (*Id.*) The author also indicated that Plaintiff's grip strength was estimated to be 4.5/5. (*Id.*) Plaintiff's ADL's were not tested and the author recommended evaluation by a physical therapist. (*Id.*)

On April 9, 2012, Elizabeth Hoffman, Ph.D., a State agency consultant, reviewed the evidence of record (noting there was no opinion evidence (R. 106), to that date and completed a Psychiatric Review Technique. (R. 105-06.) She concluded Plaintiff had moderate restrictions of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence of pace, and no repeated episodes of decompensation, each of extended duration. (R. 105.) Dr. Hoffman also completed a Mental Residual Functional Capacity Assessment and concluded that Plaintiff was moderately limited in

---

[3] The signature on the form is not legible and there are no other identifying features on the page.

her ability to carry out detailed instructions, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and her ability to respond appropriately to changes in the work setting. (R. 109-10.) Dr. Hoffman provided the following additional explanation:

> [Claimant] does not receive op therapy but she takes psychotropic medication prescribed by her treating physician. . . . ADLs: [Claimant] has physical limitations that adversely affect personal care and other ADLs. She needs reminders. However, she can cook, clean, go out alone, drive at times and shop but she has limitations in memory and concentration that adversely affect money management. Her moodiness adversely affects social functioning and adaptation. Despite her limitations, the [claimant] is able to meet the basic mental demands of simple routine work on a sustained basis and her [statements] of disability are found to be partially credible.

(R. 110.)

On April 13, 2012, Jay Shaw, M.D., completed a Residual Functional Capacity. (R. 106-08.) The RFC was for the twelve months after the alleged onset date, i.e., December 19, 2011, to December 19, 2012. (R. 106.) He opined that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk for a total of two hours and sit for about six hours in an eight-hour workday, and pushing and pulling were unlimited. (R. 107.) Dr. Shaw noted that as of April 4, 2012, Plaintiff used

18

a cane to ambulate and the use was discretionary, as of March 23, 2012, a neurological evaluation indicated Plaintiff had a wide-based gait and light limp, and she had normal power in her extremities except for mild weakness of 4.5/5 in her right lower extremity.  (R. 108.)  He opined that Plaintiff was healing well, making adequate progress, and was expected to be able to do sedentary work before December 2012.  (R. 107.)

On July 11, 2012, Dr. Mayers of Life Management Associates completed a Mental Impairments (12.04) form for the period from April 27, 2012, to July 11, 2012.  (R. 1117.)  He opined that Plaintiff had depressive symptoms characterized by sleep disturbance, psychomotor retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking which resulted in marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner.  (R. 1117-18.)

On January 2, 2013, Keith R. Kuhlengel, M.D., opined that for the period from January 2011 to January 2, 2013, Plaintiff could stand/walk for less than one hour at a time for a total of one hour per day, she could sit for one-half hour for a total of two to three hours per day, and she could drive for ten to thirty minutes for a total of one hour per day.  (R. 1185-86.)  Dr. Kuhlengel

further found that Plaintiff could occasionally lift/carry fifteen pounds, frequently ten pounds and no restrictions for less than ten pounds, she could not use her feet for repetitive movements, could occasionally kneel and climb stairs but could not bend/squat, crawl, climb or climb a ladder. (R. 1186-87.) Regarding hands, arms and shoulders, Plaintiff could not power grip, push or pull; she could occasionally do simple grasping, medium dexterity, fine manipulation, feel, and reach at or below shoulder level; she could frequently do forearm rotation. (R. 1188.) For the twelve month period indicated, Dr. Kuhlengel opined that Plaintiff could do less than sedentary work and he opined that her condition was likely to remain constant for the following twenty-four months. (R. 1189-90.) Finally, Dr. Kuhelengel noted that Plaintiff's medications affected her negatively to a small degree in that they had sedating side effects. (R. 1190.)

On January 24, 2013, Gary Thomas, M.D., completed a Neurological Impairments (11.09) form. (R. 1213.) For the period of January 24, 2013, to January 24, 2014, he opined that Plaintiff had/would have "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station," or "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in

20

areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." (*Id.*)

For the same time period, Dr. Thomas completed a Job Capabilities and Restrictions form. (R. 1205-10.) He opined that Plaintiff could stand/walk for ten to fifteen minutes at a time for a total of two hours daily; she could sit for ten to fifteen minutes at a time for a total of two hours daily; and she could drive for ten to thirty minutes at one time. (R. 1205-06.) Plaintiff could never lift/carry over fifteen pounds, she could lift/carry fifteen pounds occasionally, ten pounds frequently, and had no restriction on lighter weights. (R. 1206.) Dr. Thomas opined that Plaintiff was "fatigueable" regarding the use of her feet but could drive or use pedals for fifteen to twenty minutes at a time; she could occasionally bend/squat and climb stairs but could not kneel, crawl climb or climb a ladder. (R. 1207.) Plaintiff could occasionally perform many hand, arm and shoulder actions but could not do fine manipulation, bimanual dexterity or reaching at or above shoulder level with either side and could not push/pull with her left. (R. 1207-08.) Dr. Thomas noted that Plaintiff could use her hands, arms and shoulders to push, carry and lift one to ten pounds 1% to 33% of the time but she could never push, carry and lift greater weights. (R. 1208.) Dr. Thomas concluded that Plaintiff could do less than sedentary work for the twelve months indicated and her condition was expected to remain

21

constant for twenty-four months.  (R. 1209-10.)  Finally, Dr. Thomas opined that Plaintiff was affected to a small degree by some of the medications she was on in that some of them could increase her level of fatigue.  (R. 1210.)

On July 30, 2013, Dr. Thomas completed a form in which he was asked to verify the information he had provided on January 24, 2013, in the Job Capabilities and Neurological Impairment forms. (R. 1264.)  He indicated that his opinions remained the same, and they were based on his "treatment, records on file, testing data, examinations, observations, and knowledge of Ms. Hoover, and to a reasonable degree of medical certainty."  (*Id.*)  Dr. Thomas responded affirmatively when asked if he found Plaintiff to be honest and credible in his dealings with her.  (*Id.*)

On July 24, 2013, Dr. Diaz completed a Mental Impairments (12.04) form.  (R. 1261-62.)  He concluded that Plaintiff had depressive symptoms characterized by anhedonia or pervasive loss of interest in almost all activities, decreased energy and difficulty concentrating or thinking and she had marked difficulties in maintaining social functioning and deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner.  (R. 1261.)

3.   **Hearing Testimony**

Plaintiff testified by video from Lancaster and ALJ Zanotto was in Harrisburg for the August 13, 2013, hearing.  (R. 45-97.)

22

Plaintiff testified that she stopped working after her last back surgery on December 19, 2011, but had decreased her hours because of her impairments before that time. (R. 54-58.) She said she did not go back to work after the surgery because of the pain and MS symptoms and Dr. Kuhlengel (who performed the surgery) did not allow her to return to work. (R. 58-59.) Plaintiff stated that the biggest things that prevent her from going back to work are the pain with sitting and standing too long, falling asleep, and memory issues. (R. 69.) Plaintiff thought the memory problems were related to MS. (R. 71.) When asked by the ALJ if anything had changed "as far as white matter or flares," Plaintiff responded that she had more lesions when she had been tested about two years before the hearing. (*Id.*)

Plaintiff stated she occasionally drove about thirty miles for a medical appointment and generally drove a minimum of five to ten miles a week. (R. 61.) She said she could take care of her own personal hygiene needs but needed help sometimes with things like putting her shoes on or opening a jar when her pain was acting up. (R. 61-62.) Plaintiff testified that her husband takes care of the cooking, laundry, and cleaning but she cooks about once a week. (R. 62.) Plaintiff said she unloads the dishwasher when she feels up to it, she dusts occasionally, and cleans the bathroom sink and occasionally the toilet. (R. 63.) Her husband does most of the household and outside chores because Plaintiff is not allowed to

bend, twist, or lift. (*Id.*) Plaintiff grocery shops with her husband--about once a week for thirty minutes. (*Id.*)

Plaintiff testified that she does not provide care for anyone but herself, socially her mother, sister, and mother-in-law come to visit her, and she sometimes rides with her mother to visit her sister who lives about thirty minutes away. (R. 64-65.) Other than occasionally going to a fast food restaurant, Plaintiff said she does not go out much. (R. 66.) Plaintiff added that she had stopped going to bingo--she tried it once after her last surgery and it did not go well. (*Id.*)

Regarding exercise, Plaintiff testified that she tried to walk and do pool exercises but was not able to because of her back and hip pain. (*Id.*) When asked about activities, Plaintiff said she watches TV with her family, listens to music, and uses the computer, but she does not do any sports, sewing, knitting or crocheting, explaining that she drops things and her hands shake and she has a hard time reading because her eyes blur and "go double sometimes." (R. 66, 68.) Plaintiff added that she drops things sometimes daily but at least on a weekly basis, and that she breaks things "all the time." (R. 75.) When asked about using a cane, Plaintiff said she had discussed it with Dr. Turel and he agreed it was a good idea for stability. (R. 77.)

Plaintiff testified that she has issues with constipation and diarrhea and her "bladder released" when she fell in a Walmart

parking lot.  (R. 81.)  Plaintiff also testified that at times she could go all night without sleeping and the next day would sleep for up to eighteen hours.  (R. 82.)  "[O]n a regular day" where Plaintiff sleeps eight to twelve hours, during the day she sleeps anywhere from a half hour to four hours.  (R. 83.)  Plaintiff related some of her sleep problems with medications she takes for MS.  (*Id.*)

Regarding her mental health, Plaintiff said she was treating with Dr. Diaz to monitor medication and seeing Marilyn Banks for counseling every couple weeks.  (R. 83.)  Plaintiff testified that her depression had gotten better with medication and counseling but she still had days where she was "just a mess" and days where she was "doing pretty good."  (R. 84.)

After Plaintiff testified, the ALJ talked about problems she saw with the record, noting

> [s]pecifically the problems were the medical source statements that were completed by the physicians were done without substantial support from any physical examinations. There wasn't a lot noted with a physical examination that would serve to support that on the record request that was made or the findings on the medical source statements.

(R. 84-85.)  ALJ Zanotto added that a senior attorney who reviewed the case had recommended a physical consultative exam so "that person could do the treating source's job and make some findings that would be related to the statements" because it was necessary to have some findings supporting the limitations stated.  (R. 85.)

25

The ALJ specifically noted that Dr. Diaz's report did not preclude the need for a consultative exam because Dr. Diaz had only found three depressive symptoms and four were needed to meet a listing. (R. 86.) She also explained that she could not find medical records to support the conclusions set out in the questionnaire completed by Dr. Thomas. (*Id.*) The ALJ was concerned about whether she should send Plaintiff for a consultative exam or whether she could make a decision on what had been submitted. (*Id.*)

The ALJ found most important the lack of documentation supporting Dr. Thomas's January 2013 form and asked Plaintiff how he determined the answers. (R. 87.) Plaintiff said that Dr. Thomas evaluated her himself "from the way that things had been deteriorating through when Dr. Terrell [sic] saw me and himself. He didn't send me out to anybody." (R. 87.)

Plaintiff's attorney, Shawn McLaughlin, pointed out the similarities between Dr. Kuhlengel's report and Dr. Thomas's report, noting that Dr. Thomas had been treating Plaintiff for a year and a half. (R. 88, 89.) He also said that in the July 2013 report, Dr. Thomas answered affirmatively when asked if his opinions were "based on the records on file, the testing data, his examination, observations and so on." (R. 89.) The ALJ responded that Dr. Thomas "needs to actually put it in his records. That's the big part our office has a concern with." (*Id.*) ALJ Zanotto

took Plaintiff's attorney to be arguing that Plaintiff did not need to go for a consultative exam. (R. 90.) She stated that she would take that under advisement but would send Plaintiff if "we need to send her for one." (*Id.*)

The ALJ then questioned VE Cheryl Busten. (*Id.*) She determined Plaintiff could not perform her past relevant work and then posited a hypothetical to the VE: the individual would be limited to the full range or less than full range of sedentary work in that she would need to alternate between sitting and standing; she could at most occasionally lift ten pounds; she would be limited to occasional overhead reaching, crouching, kneeling, balancing, and climbing of ramps and stairs; she could not stoop or twist and no ladders, ropes or scaffolds; and she would be limited to jobs of FED one, two or three with occasional decision making and occasional work setting changes. (R. 91-92.) The VE identified jobs that existed in sufficient numbers in the national economy which a hypothetical individual with the limitations set out above could perform. (R. 92-94.)

## 4.  **ALJ Decision**

By decision of September 27, 2013, ALJ Zanotto determined that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date of December 19, 2011, through the date of the decision. (R. 38.) She made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since December 19, 2011, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: multiple sclerosis, degenerative disc disease, status post lumbar laminectomy and fusion, obesity, osteoarthritis of the right hip, and affective disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the ability to alternate between sitting and standing at will. The claimant is capable of occasionally lifting ten pounds, of occasionally reaching overhead bilaterally, of never stooping or twisting, of occasionally crouching, kneeling, balancing, and climbing ramps and stairs, and of never climbing ladders, ropes, or scaffolds. Further, the claimant is limited to jobs with a General Educational Development of one, two or three in reasoning, mathematics, and language, and with occasional decision making and changes.

6. The claimant in unable to perform any past relevant work (CFR 404.1565).

7. The claimant was born on September 24, 1965 and was 46 years old, which is

defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 19, 2011 through the date of this decision (20 CFR 404.1520(g)).

(R. 28-38.)

The ALJ specifically considered Listing 11.09 for multiple sclerosis and Listing 12.04 for Plaintiff's mental impairment. (R. 29-32.) She concluded that Plaintiff did not meet the necessary criteria under either Listing. (*Id.*)

The ALJ discussed her RFC determination at length. (R. 32-37.) She found Plaintiff not to be completely credible regarding the intensity, persistence and limiting effects of her symptoms for

several reasons.

Citing Plaintiff's April 2, 2012, visit with Dr. Turel, the ALJ noted that Plaintiff did not report any clear attacks or changes in her status regarding MS following the alleged onset date. (R. 33 (citing Ex. 18F).)[4]  The ALJ reviewed Plaintiff's complaints and Dr. Turel's physical examination findings, including normal and symmetric motor tone with equal power in the upper extremities and mild weakness in the left lower extremity.  (R. 33.)  ALJ Zanotto noted that Plaintiff uses a cane at her discretion and "takes once daily medication Aubagio (Exhibit 32F), which appears to control the relapse MS symptoms because she has not had recurrent treatment from neurology for MS symptoms."  (Id.)

Regarding Plaintiff's degenerative disc disease and surgeries, the ALJ noted that radiographic studies showed proper hardware placement, the most recent September 2013 MRI study revealed mild disc bulges at L1-2 and L2-3 with no stenosis and facet degenerative changes at L4-5 and L5-S1, and the Bone Spect CT found facet degenerative activity at L3-4.  (R. 34 (citing Exs. 16F/3, 29F/8, 29F/9).)  After reviewing this evidence, the ALJ adds: "however, surgical intervention was not recommended and she was told to continue exercising."  (R. 34 (citing Ex. 29F).)

The ALJ's review of Plaintiff's mental health included her

---

[4] Exhibit 18F and Exhibit 20F are the same.  (Doc. 6-14 at 70-72; Doc. 6-14 at 85-87.)

notation that Plaintiff did not begin mental health treatment until April 2012, she underwent routine and conservative treatment, she generally reported that she was doing well, and she stopped psychological treatment in October 2012 though she continued with psychiatric treatment and psychotropic medication. (R. 34.)

The ALJ concluded that Plaintiff provided inconsistent information regarding her daily living activities in that she has described activities that are not limited to the extent one would expect given her complaints of disabling symptoms and limitations. (R. 34.) Preparing meals, care for pets, doing household chores, shopping, and visiting with friends were some areas where the ALJ found Plaintiff's admitted abilities to be inconsistent with claimed limitations. (*Id.*)

The ALJ gave significant weight to the opinions of Dr. Shaw and Dr. Hoffman because she found them consistent with clinical observations, improved symptoms, routine and conservative treatment, and Plaintiff's activities of daily living. (R. 34-35.)

ALJ Zanotto found that the opinions of Dr. Kuhlengel and Dr. Thomas were entitled to little weight to the extent they found Plaintiff more limited than the ALJ's RFC findings. (R. 35.) Both opinions were afforded little weight for the following reasons: Plaintiff had routine and conservative treatment regarding her lower back and right hip following the alleged onset date; and clinical examinations, radiological findings, and the claimant's

admitted daily activities and functional abilities suggest greater functioning than the opinions. (*Id.*) Dr. Kuhlengel's opinion was also undermined because it covered a period beginning in January 2011 when Plaintiff was working a competitive job. (*Id.*) Regarding Dr. Thomas's opinion, the ALJ noted that it was based on Plaintiff's subjective complaints of fatigue exacerbated by medications but the medical record does not indicate findings that the Plaintiff actually suffered debilitating effects from these symptoms. (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5] It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a

---

[5] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that

exist in the national economy that Plaintiff is able to perform. (R. 37-38.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social

34

> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v.*

*Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

# IV. Discussion

## A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## B. Plaintiff's Alleged Errors

As set out above, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons:

1) the ALJ incorrectly concluded that Plaintiff does not meet or medically equal Listings for multiple sclerosis and affective disorders; 2) the ALJ incorrectly concluded that Plaintiff can perform sedentary work; 3) the ALJ did not properly analyze Plaintiff's need for restroom breaks; and 4) the ALJ did not properly analyze the effect of medication on Plaintiff.  (Doc. 9 at 7.)

1.    **Impairment Listings**

Plaintiff first argues that she meets Listings 11.09 for multiple sclerosis and 12.04 for affective disorders.  I disagree.

*a. Listing 11.09*

Plaintiff's main argument is that the ALJ relied on "bald assertions" rather than Dr. Thomas's opinion in concluding that Plaintiff did not meet Listing 11.09.  (*See*, *e.g.*, Doc. 9 at 9-10.) While it is true the ALJ did not discuss Dr. Thomas's form opinion that Plaintiff met Listing 12.09 (R. 1213, 1265) in her discussion of the Listing (R. 29-30), I read her decision as a whole and conclude she did not err in not relying on Dr. Thomas's opinion. As set out above, in her discussion of opinion evidence the ALJ explains several reasons the opinion was entitled to limited weight, including that "the medical record does not indicate findings that the claimant actually suffered debilitating effects from these symptoms."  (R. 35.)  Our careful review of the record indicates the ALJ's statement regarding the medical record is

38

factually accurate: the record contains opinions from Dr. Thomas (R. 1213, 1264-71) but we do not find treating notes, test results or any other objective indicia regarding Plaintiff's multiple sclerosis and its effects. Correspondence from Dr. Turel to Plaintiff dated April 11, 2012, indicates that Plaintiff was scheduled for an appointment with Dr. Thomas in July 2012 for MS follow up. (R. 1003-04.) The last Outpatient Note from Dr. Turel is dated March 23, 2012. (R. 1007-09, 1008-09.) We do not find notes from a July 2012 visit with Dr. Thomas or from anyone treating Plaintiff's MS after Dr. Turel. As pointed out in our review of the ALJ hearing, ALJ Zanotto discussed this problem at the hearing and Plaintiff's counsel did not direct the ALJ to any specific treating/diagnostic records but rather pointed the ALJ to Dr. Thomas's statement that "his opinions are based on the records on file, the testing data, his examination, observations and so on, and he says yes. So, we've got validation." (R. 89.) The ALJ responded that Dr. Thomas "needs to actually put it in his records." (*Id.*)

The ALJ clearly acted in accordance with the regulations in affording limited weight to an opinion which, in the record, is based only on a treating doctor's assertion that he has a basis for the opinion. The treating source's opinion is only entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §

404.1527(c)(2). When not given controlling weight, factors

considered include:

> (ii) Nature and extent of the treatment
> relationship. Generally, the more knowledge a
> treating source has about your impairment(s)
> the more weight we will give to the source's
> medical opinion. We will look at the
> treatment the source has provided and at the
> kinds and extent of examinations and testing
> the source has performed or ordered from
> specialists and independent laboratories.  .
> . . When the treating source has reasonable
> knowledge of your impairment(s), we will give
> the source's opinion more weight than we
> would give it if it were from a nontreating
> source.

> (3) Supportability. The more a medical source
> presents relevant evidence to support an
> opinion, particularly medical signs and
> laboratory findings, the more weight we will
> give that opinion. The better an explanation
> a source provides for an opinion, the more
> weight we will give that opinion.

20 C.F.R. § 404.1527(c)(2)(ii), (c)(3).

Of importance here, the ALJ and this Court cannot look at the

treatment Dr. Thomas "has provided and at the kinds and extent of

examinations and testing" he has performed or ordered from other

sources and Dr. Thomas has not presented "relevant evidence to

support [his] opinion." *Id.* As a result, Dr. Thomas's opinion

regarding Listing 11.09 is entitled to little weight and the ALJ

did not err in not relying on Dr. Thomas's conclusion that

Plaintiff met Listing 11.09.

*b.    Listing 12.04*

Plaintiff argues the ALJ erred in concluding that she did not

40

meet Listing 12.04 for affective disorders because Dr. Mayers opined that Plaintiff met the Listing and Dr. Diaz opined that Pliantiff met all but one of the items of the Listing. (Doc. 9 at 12.) As with Listing 12.04, consideration of the ALJ's decision as a whole indicates she did not err.

ALJ Zanotto assigned little weight to Dr. Mayers' opinion that Plaintiff's depression meets Listing 12.04 because she found it

> inconsistent with the mental health records, particularly the routine and conservative treatment and the mild to moderate symptoms reported by the claimant. Further, the opinion is inconsistent with the mental status examinations finding mostly normal findings with depressed mood (Exhibit 26F). Finally, the opinion is inconsistent with Dr. Mayers' GAF score of 63, which suggests no more that mild symptoms or difficulties with depression.

(R. 36.)

A review of Dr. Mayers' treatment notes set out above verifies the ALJ's assessment. Dr. Mayers' noted Plaintiff's mild to moderate improvement at her visits in June, July, and August 2012. (R. 1153, 1155, 1157.) The ALJ accurately referenced the assessed GAF score of 63--though a snapshot of Plaintiff's functioning at the end of May 2012 when it was assessed, there is no reason with Plaintiff's noted improvement thereafter that it did not provide the ALJ with a basis to discount his July opinion.

Dr. Diaz did not opine that Plaintiff met Listing 12.04. (R. 1261-62.) Therefore, the ALJ did not err in not relying on his

opinion when she determined that Plaintiff did not meet the Listing.

## 2. **Residual Functional Capacity**

Plaintiff next argues that the ALJ incorrectly concluded in her residual functional capacity determination that Plaintiff can perform sedentary work. I conclude this matter is properly remanded for further consideration of this issue.

Plaintiff's main arguments in support of this claimed error are that the ALJ did not properly consider her pain symptoms, her activities of daily living, and the opinions of her treating physicians. (Doc. 9 at 15-22.) Because Plaintiff focuses on the opinions of her treating physicians, we will do the same.

As discussed above, the ALJ did not err in discounting the opinions of Dr. Mayers and Dr. Thomas. Regarding Dr. Diaz, the ALJ stated that she gave less weight to the GAF score of 50 he assessed in June 2012 than to the GAF of 63 assessed by Dr. Mayers. (R. 36.) We find no error in the ALJ's determination that the score of 50 is consistent with serious symptoms and such symptoms are not supported by the record. As reviewed above, Plaintiff reported improvement with medication and Dr. Diaz routinely found Plaintiff's mood to be good. (R. 1225-26, 1230-31, 1235, 1240.) Although she sometimes reported to her individual therapist, Marilyn Banks, that she was not doing well because of financial difficulties, family matters, and physical problems, Ms. Banks

often noted improvement and an ability to address these issues. (*See*, *e.g.*, R. 1216, 1218, 1219, 1221, 1235, 1240.)  Thus, the ALJ did not err in assessing less weight to Dr. Diaz's assessed GAF score of 50 than to Dr. Mayers' GAF score of 63.

As set out above, the ALJ discounted Dr. Kuhlengel's opinion because: Plaintiff had routine and conservative treatment regarding her lower back and right hip following the alleged onset date; clinical examinations, radiological findings, and the claimant's admitted daily activities and functional abilities suggest greater functioning than the opinions; and the opinion covered a period beginning in January 2011 when Plaintiff was working a competitive job.  (R. 35.)  I conclude that the last basis is the most sound reason to discount the opinion in that Plaintiff's alleged onset date is December 19, 2011, and an opinion that Plaintiff was capable of doing less than sedentary work over eleven months before that date renders the opinion questionable.  However, the other reasons cited for discounting Dr. Kuhlengel's opinion are problematic in that, after the alleged onset date, no examining source medical evidence/opinion contradicts Dr. Kuhlengel's findings, and the "routine and conservative treatment" assessment is not made by a medical source.  Rather, in her analysis of Plaintiff's RFC, the only medical sources relied upon are the State agency reviewing doctors.  (R. 34-35.)

As set out in the regulations, the weight given nonexamining

sources (because they have no examining or treating relationship with the claimant), depends "on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."   20 C.F.R. § 404.1527 (c)(3).

State agency reviewing physician, Jay Shaw, M.D., opined on April 13, 2012, that x-rays showed normal healing after Plaintiff's December 19, 2011, surgery, that Plaintiff was making adequate progress, and it was "expected that before 12/2012 she would be able to perform at least sedentary work." (R. 107.)  Dr. Shaw did not review significant medical evidence generated after his review, including Dr. Kuhlengel's notes from his continuing treatment of Plaintiff which show ongoing complaints of pain and discussion of Plaintiff's limitations (*see*, *e.g.*, R. 1040, 1193, 1194-95), additional diagnostic studies (*see*, *e.g.*, R. 1194), in addition to Dr. Kuhlengel's January 2, 2013, opinion in which he concluded that Plaintiff had been and would be capable of less than sedentary work with her condition expected to remain constant over the next twenty-four months (R. 1185-90).

Because Dr. Shaw was not an examining source and because his assessment did not include significant evidence, the weight given his opinion is problematic.  The lack of evidence contradicting Dr. Kuhlengel presents a further problem in that Dr. Kuhlengel treated

44

Plaintiff over a long period.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Because of the absence of evidence contradicting Dr. Kuhlengel and the limited weight due the nonexamining medical source, I cannot conclude the ALJ's RFC determination is based on substantial evidence. Therefore, this matter must be remanded for further consideration.

In this regard, I note that, for the reasons previously discussed, I do not base my determination that remand is required on Dr. Thomas's opinions of January 2013 and July 2013 that Plaintiff can do less than sedentary work. (*See*, *e.g.*, R. 1264-71.) However, upon remand, consideration of the combination of

Plaintiff's impairments is warranted. As discussed by the ALJ at the August 13, 2013, hearing, the absence of evidence related to Plaintiff's MS treatment is problematic and hinders a full evaluation of Plaintiff's claim. (R. 84-90.) Although the last office notes for MS follow up are from Dr. Turel in March 2012 and the record contains an April 2012 letter from him to Plaintiff (R. 1003-04, 1008-09), Dr. Thomas references his treatment of Plaintiff in a form he completed on July 30, 2013. (R. 1264.) Plaintiff and other sources also indicate that Dr. Thomas treated Plaintiff for MS, including the following: Dr. Kuhlengel noted that Dr. Thomas conducted an EMG/nerve conduction study on October 29, 2012 (R. 1194); in January 2013, Plaintiff reported to Dr. Diaz that she was undergoing additional testing for MS treatment (R. 1240); and Plaintiff reported to Ms. Banks in April 2013 that she had recently been in the ER due to side effects of MS medication (R. 1254). It is also noteworthy that in the period after she treated with Dr. Turel, Plaintiff reported to other providers that her MS was becoming more symptomatic and her activities were more limited by her symptoms. (*See*, *e.g.*, R. 1195, 1235, 1259.)

Although ALJ Zanotto did not err in assigning little weight to Dr. Thomas's opinion, her conclusion that Plaintiff has not had ongoing treatment from neurology for MS symptoms (R. 33) is subject to question based on inferences contained in the record. Upon remand proper determination of Plaintiff's RFC requires

46

consideration of all of Plaintiff's impairments and their combined effect, including her MS and affective disorder. Because Dr. Turel more than once noted that Plaintiff was unable to work (for at least a period of time) because of the combination of her MS and her back problem (R. 1012, 1014) and because there is some evidence that Plaintiff had ongoing treatment for her MS and that her MS symptoms worsened, further development of the record regarding Plaintiff's MS is specifically indicated.

**3.   Vocational Expert Hypothetical**

With her claimed error that the ALJ did not properly analyze Plaintiff's need for restroom breaks, Plaintiff posits that this should have been included in the VE's hypothetical. (Doc. 9 at 23-24.) We agree with Defendant that this does not constitute error (Doc. 10 at 19-20), particularly in that Plaintiff's attorney did not request the inclusion of the need for bathroom breaks in the hypothetical. However, because remand is required for consideration of Plaintiff's impairments in combination, related issues like the need for bathroom breaks will also be reviewed.

**4.   Medication Side Effects**

Finally, Plaintiff asserts the ALJ did not properly analyze the side effects of medication. (Doc. 9 at 24.) Because both Dr. Kuhlengel and Dr. Thomas opined that Plaintiff's medications negatively affected her ability to work to a small degree and they made these assessments in the context of finding that Plaintiff was

capable of less than sedentary work (*see*, *e.g.*, R. 1270-71), this issue will also be reviewed upon remand.  Therefore, further discussion is not required.

### V. Conclusion

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: September 30, 2015